Ford, J.
Upon the trial of this cause before the late chief justice, a verdidt was found for the defendant, which the plaintiffs move to set aside, on the ground of its being rendered *against the weight of evidence. It appears that Samuel Holcomb, the defendant, had endorsed four notes, as security for his brother George, to the State Bank; three of which bore date the 21st of March, 1814, and amounted together to the sum of eight thousand eight hundred and forty dollars; and the fourth bore date the 5th of July, 1814, for the further sum of seven hundred and fifty-nine dollars and thirty-six cents, amounting altogether to nine thousand five hundred and ninety-nine dollars and thirty-six cents, for all which the defendant stood responsible, as endorser and security for his brother George. And besides this, his brother owed the bank eleven thousand four hundred and seventy-seven dollars and eighty-one cents, on various other paper, whereon the defendant was not endorser ; but the debts being very large, the defendant became uneasy under his responsibilities, notwithstanding the great value of his brother George’s real estate. It further appears, that his brother George, on the 28th day of June, 1814, gave his bond to the bank in the sum of thirty thousand dollars, and secured it by a mortgage on his real estate, in the county of Hunterdon, which real estate was estimated to be worth the sum mentioned in the bond. But there was a great dispute about what the bond and mortgage were given for; the bank alleges that they were given as collateral security for all the "debts which were then owing to the bank by George Holcomb, whereas it is insisted, on the other hand that this collateral security was given by George, and accepted by the bank, upon express condition that his brother Samuel, the defendant, .should be discharged from all responsi *221 bility as endorser on his brother’s paper; yet that he was sued in this action upon all four of those endorsements. There was no written memorandum given by the bank, of the terms on which they accepted the bond and mortgage, and both parties resorted to parol evidence for proof. The defendant relied chiefly on the testimony of George Holcomb himself, the person who gave the bond and mortgage ; and the bank relied chiefly on the testimony of Daniel W. Disborough, their cashier. Both of them were respectable and credible witnesses, and neither of them had any interest in the event, for the cashier did not own any stock in the bank, and George Holcomb had a release from the defendant. It was proved that Mr. Bray, the ^president did the out door business of the bank. George Holcomb testified that his brother, the defendant, being endorser and security lor him, in a large amount, to the bank, and desirous aud importunate to be relieved from his responsibilities, the witness made a proposal to Mr. Bray, the president, to give a mortgage on all his real estate in the county of Hunterdon, estimated at the time to be fairly worth thirty thousand dollars, as collateral security for all the debts of every kind that he, the witness, was owing to the bank, on condition, that his brother Samuel, the defendant, should be discharged from his responsibility to that part of them for which he was endorser; that Mr. Bray not only agreed to the proposal, but advocated the propriety of the measure, and went with him into Hunterdon county to view the property; and declared after such examination, that if the witness would mortgage the whole of it to secure ail debts which he owed as drawer, endorser or otherwise to the bank, that he, the president, would release the witness’s brother Samuel from his liability as endorser to the bank on all the witness’s notes; and added moreover, that it must be an'unpleasant thing to be teased by his brother Samuel about his endorsements; that the bond and mortgage were executed by the witness, under this agreement, the same *222 day at Flemington, and there delivered to Mr. Bray, who carried the mortgage the same day to the clerk’s office and had it recorded; that the notes were not delivered up, because they were to remain in the bank as valid charges against the witness, but not against his brother; for the bond and mortgage were not designed to express the sum due, but a sum sufficient to cover the whole amount of witness’s debts however owing to the bank;. that it was agreed to release his brother Samuel from the note of seven hundred'and fifty-nine dollars and thirty-six cents; that the notes which became due about that time led to an arrangement; but the mortgage was not to be security for notes given afterwards. Taking this evidence by itself, it would leave the jury no room to doubt that the bond and mortgage were given and accepted for both purposes, that is to say, as collateral security, and likewise in discharge of the defendant’s liabilities as endorser for his brother. We must suppose that Mr. Bray made known to the directors the conditions, whatever *they were, for which the bond and mortgage were made to them for this vast amount, and then their receiving and enforcing the mortgage, evinced an agreement on their part to the conditions, whatever they were, sufficient to bind them.
Let us now examine that evidence, on the other side, which is supposed by the plaintiffs in their argument, to outweigh the foregoing. The cashier testified that the lands so mortgaged, did not bring enough when disposed of by public sale, to satisfy the just demands of the bank against George Plolcomb, but fell short of them, and left a balance still owing, which amounted in the year 1823, to 7,688 dollars 29 cents. We suppose this to be true as stated, but to be at the same time, very immaterial to the cause, for if the plaintiffs took the mortgage in lieu of the defendant’s responsibility, and the mortgaged turned out unfavorably, they cannot resort back again, for that reason, to his responsibilities in the face of their agreement to his discharge. It *223 is testified that this great and valuable property was sacrificed by selling it under the hammer for cash at 4,500 dollars less than was actually offered for it on credit, with reasonable installments; and again by the bank giving notice before sale, that it would not receive its own notes of any purchaser in payment; but I consider this equally immaterial, because the present question is not how well or how ill they managed the property after they got it, but whether they took it in satisfaction and discharge of the defendant’s endorsements. I, therefore, pass by these unimportant topics in order to consider how far the cashier’s testimony was contrary to that of George Holcomb. The cashier first stated that the bond and mortgage were brought by Mr. Saxton or George lloleomb, to the bank; but being afterwards called, upon further recollection, he said, as to this matter, that he could not bo positive; he did not deny that they were delivered to the president, at Flemington, and, therefore, in this there was no contrariety between them. Heither witness could swear who brought them to the bank, but as they appeared to have been delivered to the president, at Flemington, a jury, in the absence of other proof, might fairly presume that they were brought by the president himself. But again, the cashier thinks that he, himself, was the most active person in inducing George Holcomb to make the mortgage, and *he swears that before it was made, the defendant wanted, (meaning probably proposed) that in consideration of it he should be entirely released, but was told (by the cashier himself, as I understand it) that the bond and mortgage were not intended to discharge either the drawers or endorsers from their liabilitiy. How this conversation with the defendant, before George Holcomb and the president went to Hunterdon to view the property, may bo every word true, and doubtless is so, yet tho president afterward, on viewing the property, may have agreed to discharge the defendant, as sworn to by George Holcomb. Both these *224 statements may be true, without impairing the weight of either, and therefore in this there is no contrariety. The president at one time may have been as firmly resolved as the cashier, not to discharge the defendant, but when he came to view the great value of the property that could be obtained in security for all that George Holcomb owed, and if refused, the probability that George Holcomb would mortgage it all to his brother, the defendant, whom it was his evident intention to secure, as an innocent endorser, the president may have changed his mind, and for very good and wise reasons have thought it best for the bank to discharge the defendant and lay hold of the property. A jury might reasonably enough have adopted this belief consistently with what each of the witnesses have thus far testified, and the weight of evidence so far, is manifestly on the side of the verdict. But again, the cashier, afterward, in a subsequent part of his examination, testified that Samuel Holcomb, the defendant, wanted to take the notes, but was told that the bond and mortgage were not intended to release either the drawers or endorsers from their responsibilities. The state of the case does not shew whether this is the conversation before stated, and repeated over again; or, whether this was subsequent to the giving of the mortgage; but it is immaterial which way it is taken ; for a conversation prior to the morgage could not control what was afterwards done at Flemington; nor could a conversation after the mortgage had been given, vary the terms on which it had been given and accepted; for after the bank got possession of the mortgage on certain conditions, its answers and sayings could not alter or vary those conditions without the assent of the other party ; and such *assent was here wanting, inasmuch as the defendant applied for the discharge; and the jury.were clearly right if they considered the defendant’s application to be discharged and the bank’s refusal to do it, as no proof either way, of what the conditions were, .at the time the mortgage was made at Flemington; and *225 herein the jury were evidently right. So when the cashier finally swears, that the defendant wanted to be discharged, but the bank always refused, it may again be observed, that neither the cashier nor directors were at Memington when the president took the mortgage, and if he took it only on condition that Samuel should be discharged, the bank ought either to comply with the condition, or else to deliver up the security, for it is not consistent with good faith to keep the security and yet refuse to comply with the condition on which it was wrung from the owner; so that what the bank said before or after the president took the mortgage is not the point in dispute, but what was the condition at the time he took it. The directors were not bound to accept the mortgage upon a condition they disapproved of, merely because the president had agreed to it; they had a right to reject the security and the condition together, but no right to separate them, and enforce the mortgage without the condition, if there was one; for they, in acceding to one, virtually acceded to the other, if the fact be that there was a condition. And as to this, there was but one witness present, the mortgagor himself, who appeared before the jury (not to deny his debts or exonerate himself) and swore, that his object in giving this voluntary and vast collateral security, was to exonerate his brother from his endorsements, and that the president agreed to take it on that condition at the time it ivas made ; and as thore was no evidence or very little if any, to conflict with this testimony, the jury found in conformity to it, and the weight of evidence appears to me so far, in favor of their verdict and not against it.
The next questiou is whether the note of seven hundred and fifty-nine dollars thirty-six cents, endorsed by the defendant on the fifth of July, which was seven days after the date of the mortgage, is binding on the defendant as endorser, or whether the condition was, to discharge him from this also. The mortgage bears date, and was placed *226 in the hands of the president, *on the 28th day of June, to be afterward delivered by him to the bank ; but it does not appear to have been delivered actually to the bank before the 5th of July, that is, none of the witnesses are able to declare on what day it was presented to the directors, whether before or after the 5th of July. The president took it on the day of the date to the clerk’s office in Elemington, and whether he waited to have it recorded, or returned the same day to Hew Brunswick, leaving directions to have it recorded and then sent to him by some safe conveyance, does not appear. Had it been delivered on or after the 5th of July, the bank would have had the question directly before it, w'hether to release the. defendant from this endorsement, or not to accept the mortgage. As.the cashier does not give any light in his evidence on this point, the jury was obliged to have recourse to the testimony- of George Holcomb as the only witness. And though he swears generally that the mortgage' was not to discharge endorsements made afterwards, yet he swears that it was to be a discharge for all endorsed notes that were becoming due about that time ; from which it might be inferred that the note in question was given to take up one that was previously in the bank, by way of renewal; but be this as it may; George Plolcomb swears that the notes intended by the parties, were the same on which this suit is brought, and. as this is one of them, it must consequently have existed in this- or some other form, or been in the contemplation of the president and himself at the time; and he adds, that it was agreed to release the defendant from this note expressly of seven hundred and fifty-nine dollars and thirty-six cents. The jury had no evidence on this point but his, and- he was uncontradicted by any other witness; they had to take what he said altogether, and whatever the difficulty in it might be, there was some part exceedingly explicit, that by the condition his brother was to be discharged from this very note of seven hundred and fifty-nine *227 dollars thirty-six cents. I cannot therefore say, that the verdict was contrary to the weight of evidence, because I see enough of a positive nature to found it upon. I take no notice of what is said to have been the charge of the late Chief Justice, on account of its not being before us in a proper manner, and because from what appears of it, the finding of the jury was not contrary to it either in matter of law, or. *indeed matter of fact. On the whole, let the rule for a new trial be discharged.
Drake, J., observed that he was inclined to think the verdict, especially with respect to the note of seven hundred and fifty-nine dollars thirty-six cents, against the weight of evidence. Yet there was some evidence, both positive and circumstantial, to support the verdict; and he did not feel that degree of confidence, either that the jury mistook the truth, or that justice had not been done, that would reconcile him to disturb the verdict of that tribunal whose appropriate business it is to adjudicate upon matters of fact. Pie therefore concurred in discharging the rule to shew cause.